# VICTOR E. SEGERSTROM v. R. W. WEBB AND OTHERS.[1]

August 19, 1932.

No. 28,670.

*Thompson, Hessian & Fletcher* and *Carleton F. Boeke*, for appellant.

*Junell, Oakley, Driscoll & Fletcher*, for respondents.

[1]Reported in 244 N. W. 49.

DIBELL, J.

This is an action to recover of defendants $23,775 as commission for bringing about the sale or merger of three abstract companies and a title insurance company of Minneapolis. When the parties rested the court directed a verdict for the defendants. The plaintiff appeals from the judgment entered pursuant to the directed verdict.

The trial court was of the opinion that there was evidence of a contract between the plaintiff and the defendants upon which plaintiff was entitled to go to the jury; but it held as a matter of law that the evidence fell short of proof that the plaintiff was the procuring cause of a merger which was effected.

■ Whether the plaintiff had a contract with the defendants whereby he was to have a commission for his services if he effected a sale or a merger of the corporations was for the jury. There were negotiations between him and the defendants. He claims that he and they proceeded as far as to agree upon a commission in the event of success of substantially five per cent of the consideration involved. The evidence offered by the defendants is opposed to this view. Since a verdict was directed for the defendants, the evidence must be viewed favorably to the plaintiff. There was enough in the evidence to raise an issue of fact. This was the trial court's opinion; and, agreeing with it, we pass to other features of the case.

■ The applicable law is not much in dispute. Where an agent or broker procures for his principal a purchaser ready, able, and willing to purchase on the terms proposed, or when the principal closes with the purchaser procured, on different terms, except perhaps where the agent is to have all above a net price, the agent or broker has earned his compensation. Hubachek v. Hazzard, 83 Minn. 437, 86 N. W. 426; Steidl v. McClymonds, 90 Minn. 205, 95 N. W. 906; Esterly-Hoppin Co. v. Burns, 135 Minn. 1, 159 N. W. 1069; Kief v. Himley, 180 Minn. 558, 231 N. W. 415; Dorgeloh v. Mark, 183 Minn. 265, 236 N. W. 325; note, 23 L.R.A.(N.S.) 164; 9 C. J. 603; 4 R. C. L. p. 319, § 57; 1 Dunnell, Minn. Dig. (2 ed. &

Supp.) § 1147. This rule is applicable to the securing of a purchaser as a part of the plan of a merger as claimed here.

It is essential to a right of recovery that the agent be the procuring cause. Dorgeloh v. Mark, 183 Minn. 265, 236 N. W. 325; MacGregor v. Persha, 174 Minn. 127, 218 N. W. 462; Sorenson v. Gonska, 172 Minn. 499, 216 N. W. 224; Llewellyn v. Olson, 169 Minn. 317, 211 N. W. 161; Barr v. Olson, 147 Minn. 49, 179 N. W. 563; Putnam v. How, 39 Minn. 363, 40 N. W. 258; Armstrong v. Wann, 29 Minn. 126, 12 N. W. 345; 1 Dunnell, Minn. Dig. (2 ed & Supp.) § 1149.

The plaintiff does not claim an exclusive right or agency to sell or effect a merger. See Smith v. Preiss, 117 Minn. 392, 136 N. W. 7, Ann. Cas. 1913D, 820, and cases cited; 1 Dunnell, Minn. Dig. (2 ed. & Supp.) § 1152.

In 1928 there were in Minneapolis three abstract companies. They were the Real Estate Abstract Company, the Merrill Abstract Corporation, and the Hennepin County Abstract Company. The Real Estate Title Insurance Company was the only title insurance company in the city. All of these companies were organized under the laws of Minnesota.

The Real Estate Abstract Company was incorporated in 1907 with a capital of $10,000 in shares of $100 each. This company issued no stock. It had no assets. It had no officers other than such as were named in its articles. It acted as a sort of adjunct of the title insurance company in certifying abstracts of title for its use. The Merrill Abstract Corporation was organized in 1910 with a capital of $115,000 in shares of $100 each. The Hennepin County Abstract Company was organized with a capital of $100,000. The Real Estate Title Insurance Company was incorporated in 1907 with a capital stock of $200,000 in shares of $100 each.

The defendant Robert W. Webb was the president of the First Minneapolis Trust Company, which was affiliated with the First National Bank of Minneapolis. He was treasurer of the Real Estate Title Insurance Company, and when it was reorganized under the name of the Title Insurance Company of Minnesota, as hereafter

noted, he became the chairman of the board of directors. Fifty-one per cent of the stock of the Merrill Abstract Corporation was controlled by him, and the rest of it was friendly. The Hennepin County Abstract Company was independent of the other companies. It is fair to say that the companies other than the Hennepin company were interrelated and connected and were friendly with the First Minneapolis Trust Company, the First National Bank, and other strong financial institutions more or less directly allied.

Wilton H. Towle was a university of Minnesota academic and law graduate and was admitted to the bar. From the time of his graduation he was engaged in the abstract business in different places. He had in mind the consolidation of the abstract companies of Minneapolis with the Title Insurance Company. This was not a new idea with him. He had the situation in mind as early as 1924. So had others. He had been with the Chicago Title & Trust Company as an examiner of titles for two years and worked under Ellis B. Southworth, the title officer and office manager of the company, who will come into the opinion later. He severed his connection with that company in the early part of 1928. He had determined to get into business for himself. He found nothing satisfactory in the abstract business. Things not promising well, he purchased the books of a practicing lawyer who was about to leave Minneapolis and took his office to engage in the practice of law. This was in the early days of September, 1928. He did not forget the matter of a merger. In July, 1928, he had talked with the Hennepin people and later with others.

Segerstrom was in an adjoining office occupied by a banking corporation with which he had been connected. He and Towle met casually. The latter was confiding and disclosed that he had in mind a merger of the companies. Segerstrom told him he was a promoter. Towle confessed that he was not. There was some talk about their working together on a merger. Segerstrom may not quite concede it, but it seems true that he obtained from Towle the first notion of a merger of the Minneapolis companies. Towle suggested that he see the Hennepin people and Webb. He says that their talk was that they should be equally interested in any profit-

able result, and claims that he presented a writing to that effect to Segerstrom within two or three days. Segerstrom denies that there was any talk of a division of profits. He says that Towle wanted a position with the company which should result from a merger, a vice presidency if one could be had, and a salary of $5,000 a year, and that he, Segerstrom, agreed that if a merger were had he would do as much as he could in letting Towle satisfy his ambition. That a paper providing for an equal division of profits was presented to Segerstrom and that he refused to sign it is conceded; also that by the paper Segerstrom agreed to exert his good offices in securing Towle a position in case of a successful merger. This dispute will be referred to later in an appropriate connection, but it may be said that the positions of the two men are hopelessly opposed and that a jury might take the view of either. The two parted company. Segerstrom went his way and Towle his; although Segerstrom claims, and Towle does not deny, that some time later he told Towle that prospects for a merger were good and he hoped he would have the position that he wanted.

It was the consensus of opinion among those interested in the merger that the prices of abstracts in Minneapolis were too low. They thought them to be of prime necessity to the public. Their plan was to effect a monopoly; to increase prices—not abruptly in amount—but gradually to follow the increases first made with other like ones following until prices were on a satisfactory basis; to take advantage of the economy resulting in keeping but one set of abstract books instead of three; to lessen the number of court house workers and others; and to save in rents and the cost of office and other administration. In addition to this they saw profit from the insurance feature. The Foshay Tower had been financed by Chicago investment bankers who insisted upon a title insurance policy from the Chicago Title & Trust Company; and the same feature was present in the financing of the Calhoun Beach Club, where different bankers underwrote the building and insisted upon a like policy of insurance from the Chicago company. The Minnesota company had been prosperous enough, but its business had not

been large and it was desirable that the money given for insurance be received by a Minnesota company; and it was thought quite advantageous to have a company which controlled both the abstract business of Minneapolis and the title insurance and was closely connected with strong financial interests. Others might come in, that is, they had the right to come in; but with such strong and centralized opposition the danger was not thought to be immediate.

Segerstrom went to the president of the First National Bank, who took him to Webb. The matter was discussed at some length. He went to the Hennepin abstract people and also to the Merrill people. He worked enthusiastically; and, while he claims that he had some knowledge of abstracts, it is apparent that he had only the knowledge that one dealing in real property securities commonly has. He knew nothing of the technical features of abstract making or title insuring nor of the particular troubles incident to the conducting of an abstract and title insurance business. Neither was he always clear on how a merger was to be effected, or of the precise nature of corporate ownership, or the rights relative thereto of stockholders. This has made the review a little harder. But if he procured a purchaser or brought about a merger, although the details were carried out and completed by others, he is entitled to compensation. It was for him to produce a purchaser for the companies which went into the merger; but it was not a condition to his right to compensation that he understand corporation law or that he be able to do the financing or attend to the details of a completed merger.

What was immediately in view was the selling of the properties of the four companies. It was evident that if the Hennepin company property was acquired there likely would not be much trouble in effecting a merger. There were no dissenting stockholders in view among the defendant corporations. But the first thought was the sale of all four. Segerstrom interviewed the W. B. Foshay Company people as a prospective purchaser, and it was sufficiently interested to talk and consider and indeed did give considerable serious attention. He referred to the company as "my people" without at first disclosing their identity to the defendants. His

plan did not put the defendant companies in the combination. It contemplated a monopoly in another company, the Foshay company, and cash for the defendants who sold to it.

Under date of December 1, 1928, Segerstrom wrote the Foshay people inclosing fantastic computations which he had made indicating net annual earnings of $157,957.50 on a purchase price of substantially $600,000, with a prophesied annual increase from year to year. Still the Foshay company did not get so much interested as to invest money or finance a merger, and efforts to get favorable action from it seemed hopeless. On December 19, 1928, Segerstrom wrote to Webb telling of his efforts and his failure. In closing he stated :·

"In consequence of the above, I regret to have to inform you that I do not feel warranted to entertain hopes that I will be successful to arrange the purchase at least not with the people that are now interested, and whom I assure you have gone into the matter very thoroughly, and in the very best of faith, and who have also used every effort with me to find a basis to warrant paying the price asked. I am of the opinion that I could close the deal on the basis of $284,114.00 for the Title Insurance Company assets to be based on the statement given me in October, and to pay for the Real Estate Abstract Co. $115,886.00. Total for the Title Insurance Company and the Real Estate Abstract Company, $400,000.00. And to buy the stock of the Merrill Abstract Company on the basis of a total valuation of $100,000.00 on conditions that the other abstract company will make certain reductions, which I have reason to believe will be done. On this basis I will reduce my commission to 2½%.

"I have worked out a concrete plan for a merger of the three abstract companies, and this presents quite an interesting picture and if you are not interested in a sale as outlined above, I should be glad to have the opportunity to lay before you a plan for a merger."

Webb answered on December 21, 1928, as follows:

"Your favor of the 19th inst. received. That there may be no misunderstanding as to our conversations, let me repeat:

"1. That the price at which I told you the Merrill Abstract Company could probably be bought was $115,000—not $100,000.

"2. That the price at which the directors of the Real Estate Title Insurance Company were willing to recommend a sale of their stock to their stockholders was on the basis of $450,000—not $400,000. This includes the Abstract Co.

"3. That you have been acting on behalf of your own undisclosed principals and not on our behalf.

"I would be willing to submit a bona fide and substantial offer approximating the foregoing figures but I do not and have not given any assurance of its acceptance.

"I understand from your letter that your principals are not interested in the matter on the basis above indicated."

This may be taken to be a substantial ending of hopeful negotiations with the Foshay people, although Segerstrom did keep up his work for a few weeks; but in any event in the early days of January, 1929, the hope for a sale to the Foshay company was gone. The plaintiff can base no claim upon the negotiations with the Foshay people; nor is it shown that he had worked out a concrete plan for a merger of the three abstract companies.

About January 18, 1929, Segerstrom had some further talk with Webb about the Chicago people. His intimation is that after Webb was shown the suggested profit of $150,000 per year he advised his going to Chicago. He took the matter up with the Farnum company, a banking house in Chicago, and met their attorney who had been in charge of a successful merger in Kansas City. Upon his return he informed Webb that the Farnum people would come to Minneapolis any time. Webb told him that he was going away, which was a fact, and he could not take it up immediately, but to wait a month, when he would return; that he talked with the Hennepin company people the same day by phone and was told, he says, that the Webb people were "working behind your back," that

"they are deceiving you," and asked him to come over. He did this and later had a talk with Webb over the phone, and Webb told him that "there had been no papers signed," and further said, "that is all there is to it." That was the last talk he had with Webb. Segerstrom did not contact the Chicago Title & Trust Company. There is no evidence that it was a prospect worth seeing. He had a conversation with one Fredericks, but nothing came from it. When he returned from Chicago he had not produced a purchaser or secured a merger; so up to this time there was nothing earned.

Segerstrom's last chance is through a claim that he has a right of recovery because of his relationship with Towle, who was concerned with the merger finally effected.

About Christmas, 1928, Towle went to Chicago and contacted with Southworth, whom we have mentioned before. He suggested the expediency of a merger, the plan to be worked out in such manner as circumstances permitted. Southworth was anxious to get into such an organization and secure for himself an executive position of importance. He did not hesitate. He was cognizant of the Minneapolis abstract and title situation through two men of the Chicago company who had examined the title to the Foshay Tower when it was financed and insurance taken; and through the men who examined the title to the Calhoun Beach Club some time later and for the same purpose. In the early days of January, 1929, he came to Minneapolis. He talked with Webb and the Hennepin company people and others. A tentative plan was arranged. The question of financing or underwriting arose. The Minneapolis Trust Company did not care to undertake it. The president of the First National Bank recommended Lane, Piper & Jaffray, Inc., investment brokers in Minneapolis, to Southworth. This company gave the subject consideration, and Southworth returned to Chicago. It was understood that they would investigate Southworth and the merits of the consolidation and later make their decision. Southworth was favorably received, and the idea of a merger seemed all right; but it was a money matter to be considered cautiously and coldly.

About the end of January the Lane people were ready to take the matter up with Southworth, and he again came to Minneapolis. The general outline of the scheme was satisfactory. Webb was leaving for California to be gone until about the first of April, and he suggested to his stockholders that they do not dispose of their stock—that something was pending. The Lane people purchased the Hennepin company stock on January 30, 1929, for $102,000, the company retaining certain accounts of outstanding bills owing amounting to $3,500 or thereabouts. The money was paid about February 4, 1929, by the bankers who took the stock in the names of their nominees.

The articles of the Real Estate Title Insurance Company were amended so as to increase its capital stock from $200,000 to $1,500,000. Its name was changed to Title Insurance Company of Minnesota. The properties of the abstract companies were transferred to the new company, the Title Insurance Company of Minnesota, and in general liquidating dividends were declared so that the stockholders were paid. By appropriate corporate action the holders of the 200 shares of the old insurance company were given permission to buy 1,300,000 shares of the added stock, that is, six and one-half times their original holdings, at par. A consideration of how the financing was done and who gained by the merger and financing and how much they made is foreign to plaintiff's suit for a commission. But the parties have remarked upon it at length; and it may be said that on April 15, 1929, the merger was completed, and the new title insurance company was an effective organization owning all of the property that formerly belonged to the three abstract companies and the old title insurance company. The new stock not taken by those entitled to have it was put on the market at $135 per share. In closing the financing the Minnesota company participated to the extent of 20 per cent, the First Minneapolis Company to the extent of 33 1/3 per cent, and Lane, Piper & Jaffray to the extent of 46 2/3 per cent.

The contact which Towle made with Southworth and the coming of the latter to Minneapolis and making direct and successful negotiations resulted in the merger. Without repeating too much what

is said about the connections of Towle and Segerstrom, it is not possible to hold that they were working in harmony for a common purpose or that either was to have the results of the efforts of the other. If Segerstrom had succeeded, Towle would not have had a division of commissions. He understood that Segerstrom was not working with him. He worked for himself. Segerstrom understood it so. Towle negotiated somewhat with Webb and others before he contacted with Southworth. It is not shown that he was to have a commission. He became assistant secretary of the company which took over the merged property, and a position likely was what he most wanted. There was no exclusive agency, and if Segerstrom and Towle were competitors the one who brought results would get compensation if there was an agreement for pay. Esterly-Hoppin Co. v. Burns, 135 Minn. 1, 159 N. W. 1069. Every piece of testimony that could make a question of fact to justify a jury in finding for the plaintiff has been considered, having in mind that since the court directed a verdict for the defendants a view of the testimony favorable to the plaintiff must be taken in our review; and it cannot be found that Segerstrom because of his connection with Towle was the instrumentality which brought about the merger or was a factor in its accomplishment and so entitled to compensation for what Towle or Southworth did.

After the sale by the Hennepin abstract people they paid Segerstrom $500. Before that time they had indicated that they might give him something. He accepted it and released the Hennepin people. He did not release the defendants. The Hennepin people denied liability. Apparently they thought it was right to give Segerstrom something, for he had worked. He really does not claim that the Hennepin people owe him. But aside from this, it is obvious that they had in mind warding off a lawsuit by Segerstrom. These facts are mentioned, but they require no discussion. They do not add to Segerstrom's rights.

Judgment affirmed.