# FRANK A. DAHLGREN v. CARL E. OLSON.[1]

May 6, 1949.

No. 34,853.

*A. A. Trost,* for appellant.

*Rasmus Hage,* for respondent.

FRANK T. GALLAGHER, JUSTICE.

Appeal from an order of the district court denying plaintiff's motion for judgment notwithstanding the verdict or a new trial. The action involves a rather simple dispute as to whether plaintiff is entitled to recover a real estate broker's commission from defendant.

Plaintiff has resided for many years at Alvarado, Minnesota, where he has been engaged in selling insurance and occasionally

[1]Reported in 37 N. W. (2d) 438.

some land and doing work for farmers in connection with income tax matters. According to his testimony, he talked to defendant, a farmer living about eight miles north of Alvarado, in October or November 1944, when he claims that the latter asked him if he could sell his farm, consisting of 200 acres. Plaintiff said he told him that it depended upon the price asked for the land. He then said defendant informed him that he wanted $35 an acre for his farm and that if plaintiff could sell it for that amount he would pay him $500 in cash.

When asked as to what he did about selling the farm, plaintiff testified "Oh, I had several out there to look at it and I sent a few out to look at it themselves." He named Valentine Fortier and another as prospects he sent out to see the place late in 1944, and claims that he took a man named Casbrick out to the farm about December 1944, but that defendant was not at home. He said that he took Fred Abrahamson to the place in December 1944 or January 1945, at which time he talked with defendant and his family in their house. Defendant denies that he had any talk with plaintiff on that occasion and said that only Abrahamson came into the house and that plaintiff remained in his car. He said that there was no talk about Abrahamson buying the farm, that the latter made some comment about defendant having a nice house, after which they both left the house and defendant went to the barn. This testimony seems somewhat incredible, inasmuch as defendant admits that plaintiff was in his car at the farm when Abrahamson went out with defendant to get into the car with plaintiff. It hardly seems possible that plaintiff would take a prospect to the farm without at least going into the house with him or having a talk with defendant, who was there at the time. Plaintiff claims that he procured the prospect who bought the farm, which we shall refer to later.

Defendant admits having a conversation with plaintiff in October 1944, but claims that it was plaintiff who first asked him if he wanted to sell his farm and that he replied, "Yes, I might sell." When asked the price he wanted, defendant testified that he told plaintiff, "I wanted $37.50 an acre, cash, net to me and 'whatever

you get above that price is yours.'" He denies that there was ever any talk with plaintiff about selling the farm for $35 an acre. He claims that plaintiff said he had some prospective buyers and that they would come out to the farm within the next day or two, but that they did not come. He said that the next time he saw plaintiff was the day he came out to the farm with Abrahamson and that he did not see him again until about February 1, 1945.

The case was tried twice before juries, resulting in verdicts for defendant each time. There is some confusion in the testimony of defendant at the two trials, as he testified at the first trial that he told plaintiff at the October 1944 meeting that he "wanted $7,500" net cash to him for the farm and that whatever plaintiff got over that he could have, while at the second trial he said that he told plaintiff that he "wanted $37.50 cash an acre, cash net to me and whatever you get above that price that is yours." In any event, relying upon this conversation in October 1944, plaintiff claims that he showed the farm to several prospects. He testified that defendant then called on him during the latter part of February 1945 and said that he did not want to sell the land at $35 an acre. He claims that he informed defendant at that meeting that he had not asked any prospect less than $40 an acre for the land, because most of the buyers he had "in view" were North Dakota landowners who were offering and selling their land at $40 an acre, "so I figured that I wanted to protect Olson [defendant] and at the same time earn my own commission and still leave $500 for Mr. Olson." He claims that defendant then told him, "If you sell it at that [$40 an acre] why then you get your $500 in cash." Defendant, however, disputes this testimony, both as to the time of the February meeting and as to what took place. He claims that he went into plaintiff's office about February 1, 1945, and told him that a man and a woman, whose names he did not remember, were out to his farm on January 23, 1945, and said that plaintiff had told them that defendant would sell the farm for $6,500, to which he said plaintiff replied, "Oh, yes, them." Defendant then testified that he reminded plaintiff that he had told him "last fall" that he wanted $7,500 cash net to

him for the farm, not $6,500, and that he said, "It's going to make it hard for me to sell now when you have cut my price." He said that plaintiff replied to the effect that maybe someone would come around who wanted to buy and that he (defendant) said, "No, you shall not sell my farm now regardless of who comes around." To this he claims that plaintiff replied "Oh." It is his position that he thus terminated his dealings with plaintiff so far as any sale of the farm was concerned. Plaintiff denies that defendant ever told him he should not sell the farm, but claims that at the time of the February meeting, which he says took place the *latter* part of February instead of February 1, 1945, defendant merely informed him that he had decided not to sell the farm at $35 per acre and that he again agreed to pay him the $500 commission if he sold the place for $40 per acre.

There is also a difference in defendant's testimony at the two trials as to the couple who went to his farm on January 23, 1945, with the story that plaintiff had told them that defendant would sell the farm for $6,500. While defendant testified as to this at the second trial, he said nothing about it at the first trial. When questioned at the second trial as to why he did not testify as to the $6,500 incident at the first trial, he said that he "had no question to that effect." When requestioned at the second trial as to his testimony at the first trial regarding the February meeting with plaintiff, defendant admitted in effect that he then testified he had told plaintiff that "he couldn't sell my farm"; that plaintiff only said "Oh," and that he did not say anything either, although he could not remember the exact words used.

Plaintiff testified that he continued his efforts to sell the farm after the February 1945 conversation with defendant. He said that he talked with George Olson, the man who eventually bought the farm. He thought this first conversation with George was in 1944, but said that he definitely talked with him in January 1945, at which time he quoted a price of $40 an acre for the land. He explained that he told George it was a good piece of land, located on the highway, with a good house, and said that George "was going to view the

property and take his wife over there to show her the land." He said that he told defendant about this prospect sometime between January 15 and February 15, 1945, which defendant denied. He further testified that George returned to see him in February 1945 and said that he and his wife had been to see the place. When questioned as to whether there was any conversation between them as to the price, plaintiff replied, "Forty dollars an acre." He said that George came to see him again on March 13, 1945, when plaintiff again told him that it "was a good farm and 'I don't think you could improve on the purchase,' and it was worth it." He testified that the prospect then said that he was going out to see defendant and bring him in and that George was going to buy the farm. According to plaintiff's testimony, he claims that the question then came up between him and George about closing the deal and making out the papers, and that he informed the proposed buyer that he was then engaged in making out income tax papers and requested him to bring in defendant on March 16 and that he would go with them to Warren to close the deal. He said that the price he quoted George on March 13 was $40 an acre. "I told him he couldn't buy it for a cent less."

It appears that neither the prospect nor defendant went to plaintiff's office on March 16, so plaintiff went to defendant's farm with one Otto Carlson about March 20, four days later. Plaintiff claims that at that time he told defendant that he understood he had sold the farm and asked him about his commission, and that defendant replied, "You don't get a damn cent from me." He testified that he then said to defendant, "I sold your farm, didn't I?" and defendant replied, "Yes, you did." He said he then asked defendant if he hadn't promised him $500 commission if he sold it, and that defendant replied, "Yes, but you have to go and get it from the fellow you sold to."

Carlson, who accompanied plaintiff on this trip, substantially corroborated plaintiff's testimony as to the conversation at the farm that day. He said that when plaintiff told defendant he understood he had sold the farm defendant replied, "yes, I have, * * *

I sold it for my price," and that when plaintiff asked him what he had done that for defendant replied, "I was afraid I wouldn't get it sold."

Defendant testified that plaintiff never let him know that he was sending anybody out to look at his farm. He admitted that George Olson did come out on March 13, 1945, and told him that he was interested in buying the farm. He asked the price, and defendant said, "I told him I wanted $37.50 cash." Defendant said that George told him he had seen plaintiff and that he replied that plaintiff had nothing to do with his farm. He testified that he then said, "maybe I could have saved you a little money if you hadn't seen Dahlgren [plaintiff]." He said that George then said that he would "come back the day after tomorrow and buy the farm"; that George did come back on March 16 and he sold him the farm for $7,500. Upon cross-examination, defendant testified in part as follows:

"Q. So before you sold the farm to George you knew that Frank Dahlgren [plaintiff] had sent George out there to buy the farm?

"A. Not before I saw George.

"Q. Before you closed the deal?

"A. Yah, George told me that he had seen Dahlgren and I said 'Dahlgren haven't got nothing with my farm to do.'"

George Olson, the buyer, testified that plaintiff was the first one with whom he talked about buying· defendant's farm; that he first talked with him in ·January 1945 and that he talked with him about the deal five or six different times, once about the middle of February and again around March 13, 1945, which was the first time he went to see defendant, although he had previously driven past the farm. He claims that plaintiff told him in one of these conversations around the middle of February that they wanted $40 an acre, or $8,000, for the farm, and that again on March 13, when he interviewed plaintiff before going to the farm, plaintiff told him that they would not sell the farm for less than $40 an acre. When asked whether or not he was going to buy the farm, he replied, "Well, I had kind of planned on it." George testified that the first

time he saw defendant about the deal was March 13 or 14, 1945; that he had never talked to him before about it; that he knew him only by sight; and that when he arrived at the farm at that time he told defendant he was out to look at the place as he understood it was for sale. He said defendant replied that it was and asked him whether plaintiff had sent him out, and George said that he had. He testified that defendant then asked him what price plaintiff had asked for the place and he told him $40 an acre. To this reply he claims that defendant said, "Well if you had seen me first we could have saved some money." When defendant said that to him, George said he "imagined" that defendant was referring to plaintiff's commission, but that nothing was said then about which one of them was to pay the commission. It was during this conversation that George said he agreed to buy the farm from defendant for $37.50 an acre, or $7,500, but that they did not make out any papers that day.

The buyer also said that he, defendant, and defendant's wife drove through Alvarado, plaintiff's home town, on March 16 for the purpose of going to Warren to close the deal for $7,500, which he admitted was $500 less than plaintiff had quoted him for the farm. (The sum of $500 is what plaintiff claims as a commission.) George said that before they arrived at Alvarado that day he asked defendant what he was going to do about plaintiff, and that defendant told him for the first time, "Well, that's up to you." They did not stop to interview or pick up plaintiff on their way through Alvarado, but George said that they went on to Warren, where he closed the deal and bought the farm from defendant for $7,500; that plaintiff had asked him $8,000 for the farm, and that he had enough money so that he could have paid the extra $500 if necessary, but that when he got a chance to buy the farm for $500 less he naturally did so. We quote this part of his testimony as pertinent:

"Q. It was your intention when you went out there to pay the $40 an acre, that is you would have paid that if you had to?

"A. Yah, I could have."

George testified that he tried to bargain with plaintiff to get the farm for less than $40 an acre, but he did not say how much less he would pay. He claims that at no time did he tell defendant that he would pay $40 an acre for the farm, he said; "I hadn't made up my mind yet." He said that he never got to the point where he had to make up his mind that he would pay $40 an acre, as defendant never asked him that amount, but was willing to take $37.50 an acre for the farm. He further testified that defendant told him it would have to be a cash deal, but that they got together on the price of $7,500 under an arrangement whereby the buyer would be given time to get the money by making a loan on the farm.

The principal questions for consideration here are:

(1) Did plaintiff procure a purchaser ready, willing, and able to buy the land, did he send the buyer to defendant, inform him that the buyer was coming, and did the buyer purchase the land at the price demanded by the owner?

(2) Did defendant terminate the listing arrangement for the sale of the farm so as to prevent recovery of a commission by plaintiff?

It seems to us that there can be little question here, not only from plaintiff's testimony, but from the testimony of the buyer himself, that plaintiff did procure a purchaser who was ready to buy the place at plaintiff's quoted price of $40 an acre if necessary. It is true that the buyer did say that he never told defendant that he would pay the $40 an acre, as he had not made up his mind, but he also said that he never got to the point where he had to make up his mind to pay the $40, as defendant asked him only $37.50 an acre even after the prospect had told him that plaintiff had quoted him $40 an acre for the farm. It is also true that the prospect testified that he could have paid the extra $500 to make up the $40 an acre if necessary; that he had the extra money in the bank. Coupled with this is defendant's own admission, in response to a question as to whether he knew before he sold the farm to George that plaintiff had sent him out, "Yah, George told me that he had

seen Dahlgren [plaintiff]." Naturally, when defendant then said to the prospect, according to his own testimony, "maybe I could have saved you a little money if you hadn't seen Dahlgren [plaintiff]" and asked him only $37.50 an acre for the farm, the buyer would not pay him $40 an acre. Here, we have a situation where it appears to us that defendant made a new offer to the buyer, $500 less than the record shows was quoted George by plaintiff, which was also the amount of the commission claimed by plaintiff. Otto Carlson, who accompanied plaintiff to defendant's farm after the sale was made, testified that defendant told plaintiff that day that "I sold it for my price, * * * I was afraid I wouldn't get it sold."

In Schimmelpfennig v. Gaedke, 223 Minn. 542, 27 N. W. (2d) 416, the fact situation is somewhat similar to the instant case, in that there plaintiff, a real estate broker, alleged in his complaint that defendant was indebted to him for $250 for services rendered by plaintiff, at defendant's request, in connection with the sale of a farm. Defendant's answer was a general denial. We cited as a basis for what would constitute plaintiff's right to recover in that case the fact that he discovered the buyer as one ready, able, and willing to buy; that plaintiff informed him that defendant's farm was for sale; that as a consequence plaintiff got the buyer interested as a prospective customer and caused him and defendant to come together for the purpose of negotiating concerning the sale; and that as a result of such negotiations the sale was made.

In Segerstrom v. Webb, 187 Minn. 20, 21, 244 N. W. 49, we said:

"* * * Where an agent or broker procures for his principal a purchaser ready, able, and willing to purchase on the terms proposed, or when the principal closes with the purchaser procured, on different terms, except perhaps where the agent is to have all above a net price, the agent or broker has earned his compensation. Hubachek v. Hazzard, 83 Minn. 437, 86 N. W. 426; Steidl v. McClymonds, 90 Minn. 205, 95 N. W. 906; Esterly-Hoppin Co. v. Burns, 135 Minn. 1, 159 N. W. 1069; Kief v. Himley, 180 Minn. 558, 231 N. W. 415; Dorgeloh v. Mark, 183 Minn. 265, 236 N. W. 325; note,

23 L.R.A. (N.S.) 164; 9 C. J. 603; 4 R. C. L. p. 319, § 57; 1 Dunnell, Minn. Dig. (2 ed. & Supp.) § 1147. * * *

"It is essential to a right of recovery that the agent be the procuring cause. Dorgeloh v. Mark, 183 Minn. 265, 236 N. W. 325; MacGregor v. Persha, 174 Minn. 127, 218 N. W. 462; Sorenson v. Gonska, 172 Minn. 499, 216 N. W. 224; Llewellyn v. Olson, 169 Minn. 317, 211 N. W. 161; Barr v. Olson, 147 Minn. 49, 179 N. W. 563; Putnam v. How, 39 Minn. 363, 40 N. W. 258; Armstrong v. Wann, 29 Minn. 126, 12 N. W. 345; 1 Dunnell, Minn. Dig. (2 ed. & Supp.) § 1149."

Hubachek v. Hazzard, 83 Minn. 437, 86 N. W. 426, involved an action to recover a broker's commission claimed to have been earned by one Daniels for procuring a purchaser of defendants' real estate. Daniels assigned his claim to plaintiff. Defendants were the owners of a house and lot, which they placed in the hands of Daniels for sale for $8,500, his commission to be $300, but the agency was not exclusive. Daniels advertised the property for sale at $8,250. One Clark saw the advertisement and wrote his broker that he would give $6,000 cash and his furnished house for the property advertised. Clark's broker contacted Daniels and wrote Clark that the house belonged to defendants and that $8,250 was the best price obtainable. Clark then entered into negotiations with the owners and purchased the property direct from them for $8,000 cash. Defendants there insisted that because Clark did not buy the property at the price offered by Daniels, their agent, they were at liberty to sell it at a lower figure, thereby avoiding the agent's commission. We said in that case (83 Minn. 439, 440, 86 N. W. 426, 427):

"* * * Such, however, is not the law. * * *

* * * * *

"The point which appellants [defendants] seem to insist upon is that, because Clark refused to pay $8,250, the agent's figures, the owner was at liberty to sell for $8,000, without liability for his agent's commission. But the various decisions of this court have established the rule that, if an agent is instrumental in bringing

together a proposed purchaser and seller, the fact that the owner himself made the sale would not release him from his responsibility to the agent for his commission as the procuring cause. * * * It is immaterial whether the owner sold at the same price or at a lower figure than given to the agent, for the agent might still remain the efficient cause of bringing the parties together. The case would present an entirely different aspect if the owner had refused to deal with the purchaser at the time in question, had dropped all proceedings connected with it, and afterwards, through some other source or from some other cause, negotiations were opened anew. In such case, the agent would not be the procuring cause or instrumental in bringing the parties together."

■ On the next question, as to whether the contract was terminated, we believe that defendant's own conduct contradicts his claim that it was, especially in view of the denial of this termination by plaintiff. If he considered that he had nothing more to do with plaintiff when the buyer first came to his farm about March 13, 1945, it does not seem that he would have been concerned in finding out whether plaintiff had sent the buyer out, what price he asked, and in saying, "Well if you had seen me first we could have saved some money." The record clearly indicates that he had knowledge before he closed the deal that plaintiff had sent George out to buy the farm and that the price quoted was $40 an acre.

The sale was discussed for the first time between the buyer and defendant about March 13. No papers binding defendant to the sale were made out until two or three days afterward. Defendant lived only about eight miles from plaintiff's place of residence. The question of commission came up between the buyer and defendant before any papers were signed. It seems to us that under those circumstances defendant should have seen plaintiff before he bound himself to any sale and should have straightened out any question as to a commission. He had ample opportunity to do so, not only during the two or three days that elapsed between the first time the buyer called on him and the time the deal was closed, but when he

drove through the village where plaintiff lived with George on March 16 on the way to Warren to close the deal. George testified that as they approached Alvarado he brought up the question of the commission; that he asked defendant what he was going to do about plaintiff and that defendant said, "Well, that's up to you."

While we are reluctant to reverse the verdict of a jury unless it is palpably and manifestly contrary to the evidence, it appears to us, after viewing the evidence in the light most favorable to defendant, as we must, that the record compels a reversal on the ground that plaintiff did procure a purchaser, and that it seems reasonable from the buyer's own testimony that he would have paid $40 an acre for the farm if defendant had not voluntarily reduced the price to $37.50. It also seems to us under the facts and circumstances here, and particularly the conduct of defendant at the time he made the sale to George Olson, that he did not consider in his own mind that he had terminated the listing contract with plaintiff.

Reversed with directions to enter judgment for plaintiff.

Mr. Justice Knutson took no part in the consideration or decision of this case.